The board of trustees will now close the hearing. Mr. Bauer, as soon as you can be ready, we'd like to proceed. Good morning. Good morning, your honors. This is an appeal from an interference in which we believe clearly three errors of law were committed by the board. The first was that the board held that the claims were not enabled and they read out of the enablement analysis the requirement that there must be undue experimentation. The second was, in lieu of having a finding that there was undue experimentation, they made a finding that there was not a, quote, reasonable expectation of success provided by the specification as of the filing date. We submit that is clearly the wrong standard as noted in the ENSO case. You would have had a pretty good argument, perhaps, before Rasmussen, but doesn't Rasmussen effectively reject the very contention that you're making here? No, your honor, we don't think it does. In fact, in the Rasmussen case, what occurred was there was finasteride and it was a protein that was supposed to inhibit a dihydrotestosterone enzyme, which allowed testosterone to go to dihydrotestosterone. The thought was, at the time it was filed, they didn't know what caused prostatic cancer. They didn't know if it was testosterone or they didn't know if it was dihydrotestosterone. Therefore, an enzyme that would have inhibited the production of dihydrotestosterone, no one knew if that would have worked. And that is essentially a utility case. And I want to read something to you from there. But Rasmussen says, for example, 1325, it rejects the notion that respectable guesses as to the likelihood of success are sufficient. I mean, as I understand Rasmussen, and you tell me why I'm wrong or read me something from the opinion, it suggests that likelihood of success is part of this enablement inquiry and that there has to be a likelihood of success in order for it to be enabled. If you take a look at the specification of Rasmussen, which was assigned to Marquette, hundreds of… No, but I'm dealing with the opinion, not with the specification. Correct, but I think the opinion must be read in the backdrop of the facts of the case. Are you agreeing with me that the language of the opinion is against you? I do not agree that if you read carefully the language, and particularly I bring to you this quote. It says, the board based that finding on its determination that a person of ordinary skill in the art would have no basis as of the filing date for believing that finasteride could be used to treat prostate cancer. As this court has explained, the how to use prong of section 112 incorporates as a matter of law the requirement under 101 that the specification disclosed as a matter of fact of practical utility. In that case, the utility was not disclosed. In our case, in complete contrast, what we've done is it's a method for administering and putting an added virus with a growth factor into a coronary artery and then… Retreating to the facts, the case holds, as I read it, that reasonable expectation of success is part of the enablement inquiry. And if I'm wrong about that, I'd like to know it, but that's the way I read the opinion. And it seems to undercut your argument. Well, I would submit to you, Your Honor, that that case deals with if you don't know what a compound does and you have no idea what it does, then you can't withstand the utility requirement. Whereas in our case, we were putting in a known vector, an added virus, using a known gene, FTF5, which had been known to cause collateral vessel formation. Well, it sounds as though you're saying that as a factual matter there was a reasonable expectation of success. And I understand you make that argument and that you may be correct about that. But the first question is what's the test? Is reasonable expectation of success part of the test? You've argued in your briefs that it isn't. And you have a problem with the Rasmussen case in terms of the test. You may win under the Rasmussen test. That's another question. But the test includes reasonable expectation, doesn't it? I think it applies to a utility. If you do not have a compound and you don't have any idea what it does and there's no proof, then in that set of facts, then the reasonable expectation of success could come in. But in our case, it's not like Rasmussen where you had a specification which had hundreds of compounds, none of which had been tested. In our case, factually what you got is you got a vector, you put it into a coronary artery, and it expresses, and you get collateral vessel formation. In fact, Leiden showed that. Leiden showed exactly what to do. There was the recipe. The board concluded the opposite, right? Excuse me? The board concluded the opposite, correct? That's not correct, Your Honor. Your Honor, what the board actually found was if you break the claim down, you can break the claim down into making the vector, administering the vector, and evaluating the results. What the board found was that the Leiden specification told you how to make the vector. It told you how to administer it. And it also found, and I'll read this to you, that one of ordinary steel in the art could evaluate whether or not the vector caused collateral vessel formation. So in terms of the administration and in terms of carrying out the process, the board found that Leiden specification showed how to do that. And in fact, if you take a look at what Hammond did, in their case what they did was what vector did they use? They used an adenovirus. That was shown in Leiden. What promoter did they use? They used a CMV promoter. That was also shown in Leiden. What growth factor did they use? They used FGF5. That was the specific growth factor shown in Leiden. And what administration doses did they use? What was specifically shown in Leiden? There was simply no evidence, and you won't hear any today, of undue experimentation. They followed exactly what Leiden did. And the entire case hinged on whether or not there was a reasonable expectation of success provided as of the filing date. And we believe that Rasmussen doesn't contradict that. It is factually distinguishable. And particularly in light of the biotech cases with Enzo Biochem, where was the quote? Where the specific issue came up, whether or not one would need to predict whether something would work. And the court said no. Quote, prediction plays no part of the enablement analysis. And that was reiterated in the Elan case. So it's quite different from the Rasmussen case, where basically it was a pharmaceutical company trying to cover the entire field with no work. Just listing compounds, listing indications, see what would hit. That's not what we have here. And factually it's quite different. And that's why I believe Rasmussen is distinguishable from the facts that we have in this case. Now, if I could, Your Honor, I'd just like to take a little bit more on terms of the undue experimentation. And I want to read to you what the board actually found. They said that we credit the cross-examination testimony of Dr. Rangel, that's the other party's expert, to the extent it identifies both Hammond's, that's the other side's patents, and Leiden's specification as suggesting the administration of adenovirus vectors, that's the vector, having angiogenic factors, that's the growth gene, into the coronary artery, and that both specifications encompass what is alleged to be an effective dose for promoting angiogenesis. That is the recipe. And what Hammond did was not alter it one iota. What they didn't do, they alleged that all of these things, that we did not anticipate what could have occurred, but if you take a look at what Hammond did, same vector, same promoter, same growth gene, same dose. No undue experimentation, and you still won't hear it today. We believe under that set of facts, this is clearly a case where it's enabled. And unlike Rasmussen, Leiden was the actual leader in the field. Leiden was the first person to put a gene into a heart directly, he was the first person to put a growth factor into a heart and get collateral vessel formation, and he was the first person to use an adenovirus and inject it into a coronary artery and get expression. And that was the key finding. What Leiden found was that if you put an adenovirus into a coronary artery, it would actually express. In the light of the prior art, as admitted in Hammond's patent, that growth factors were well known, and their pharmacological activities were well known, that was the key missing piece. Could, when an adenovirus is put into a coronary artery, would it express? And Leiden proved that. And that's why it's entirely distinguishable from Rasmussen, who just basically had a long list of medication, hundreds of compounds, and a well-off finasteride family head as a treatment for prostatic cancer. I'd like to reserve the rest of my time for rebuttal. All right, thank you. Mr. Ashe. Thank you. May it please the Court. Mr. Ashe, do you agree that this case turns on the determination of legal issues? I do. I do. You don't think that the legal issues collapse into factual findings? I think that the factual findings, which are supported by substantial evidence, underlie the legal determinations of the Board. The Board conducted the appropriate legal analysis, and that the Board's holdings should be upheld. I don't understand you to have answered my question. You seem to be saying that given the irreversible, you say irreversible, fact findings of the Board, on the legal issues there could only be one outcome. If that's your position, then it seems to me your answer to my question is yes, the ostensible legal issue collapses into a purely factual issue. Yes. And I think the main difference between our view of the case and Leiden's view of the case is that in Leiden's view, the best disclosure under U.S. patent law for Leiden is one that is non-specific and broad. And it's good for Leiden because any invention that takes place after they've made that disclosure falls within the scope of their disclosure and allows them to lay claim to it. Likewise, they would like to use that same non-specific disclosure to knock out claims of impairment. Why does specificity rule the day? It would seem that either it's enabled or it isn't. And the degree of specificity might relate more to the state of the art at a given time because what you would have to disclose to enable would change. Right. The specificity is important because the Board found that this is a nascent and embryonic technology. And in such instances, under the enablement requirements, you need a specific disclosure. You cannot rely on what is known in the art because in such a technology, very little is known in the art. And in order to be entitled to a patent, if you're looking at the benefit issue, you need to provide sufficient disclosure to enable those. I quite agree when you say sufficient disclosure, but that doesn't necessarily translate into specific disclosure. I think if I could perhaps exemplify. With this particular invention, it is taking a virus and injecting it into the heart so that it transfers the gene to a heart cell, expresses the gene in sufficient amounts such that you physiologically alter the structure of the heart. It is an astonishing invention in that regard. Each of those steps along the way, there was recognized unpredictability. There was recognized unpredictability with regard to the use of the adenovirus. There was recognized unpredictability and unknown factors with regard to collateral vessel development. And basically what Leiden has done is provided inventing, and anybody who comes along later and combines things in such a way that they work, Leiden says, that was my invention. And I think that the evidence is clear. Even in Leiden's own publications, even in their own application, you really don't need to go any further than that to look at the state of the art, look at the level of unpredictability, and look at what they did not do to advance the art. But they're complaining about the legal standard. They're saying that the board applied the wrong legal standard. The board did not. The board considered the issue of enablement initially as it related to the benefit issue, and in considering the enablement issue, they did go into the WANs factors. They addressed numerous WANs factors. What's the correct standard here? The correct standard? Yes. They're arguing that reasonable expectation is not part of the standard. I think reasonable expectation is a part of the enablement analysis as is predictability in the art. That's standard WANs factors. In this particular instance. Standard WANs factors before Rasmussen? It was not very clear, was it? I don't think, as it applies to this particular case, that Rasmussen really alters the course of this. Rasmussen, I think, is very similar to this case with regard to the benefit issue. Leiden has suggested that it also applies as to the anticipatory effect and Leiden disclosures, but I think at the end of the day, what we're looking at is when you do the basics. So Rasmussen doesn't really help people? I don't think it hurts me. I think it does help to point out that in unpredictable arts, you do need a specific disclosure. You do need to have an enablement disclosure. The thing here is that at each step of the way, they identify the adenoviruses in their own specification. They say adenoviruses, the problem with that is that you can't get a specific location of the adenovirus to get your effect. They do their experiment and they report that it's spread throughout the body. They haven't advanced anything there. The other problem with adenoviruses is that you get low levels of expression of the protein. With their experiments, they do an assay that doesn't reflect the amount of protein that's produced. Again, they don't advance anything there. It's just repeated. It's a conglomeration of experiments, but it does not advance the art. It would not have enabled one of ordinary scholarly art to practice an invention that requires stacking multiple complex biological processes, viral infection, expression of genes, expression of genes in sufficient amount to get collateral vessel formation. These are all, at that point in time and even today, very complex areas. Under those circumstances, the walk clearly requires that they provide a specific teaching to instruct those ordinary scholarly art how to practice the invention. What they've done is they've tossed out the near term of an idea. Perhaps they've outlined a research plan, but they have not provided the detail that they need to in order to enable the invention. What are the variables at each of the stages that you mentioned that would lead to the conclusion that without more explicit instruction of how to do each of these steps, you might get no result? I think there are a number that are reflected in the record. For example, the very first step, introducing the virus into the heart. Biden's year 2000 publication acknowledges that recent studies as of the year 2000 determined that some of the catheters that were used to introduce the virus into the heart inactivated the virus. Step one, you have a problem. Step number two, how do you get enough of the adenovirus to the heart in sufficient amounts so that enough protein is expressed? As far as getting into a localized place in the body, that is exactly what the art was recognizing as being unpredictable with regard to adenoviruses. It's exactly what they described as having not overcome in their own specification. When they did the adenoviral experiment, they tested, they found the DNA through the brain and the testes throughout the body. They didn't advance the art. They thoroughly infected the body with an adenovirus. The important thing there is that you need to have enough of the adenovirus at the appropriate location so that you get enough protein expressed for a sufficient period of time so that you get collateral vessels to form. Those are the variables that are involved. At each stage, it's even more complex. In reviewing the briefs, I think it's important for the court to be aware of certain terms that are almost used interchangeably as the art is being described. It was done today in argument. An adenovirus, the count requires an adenovirus. That is a virus that goes in and infects the heart. A plasmid is a circular piece of DNA. It is completely different for purposes of this invention than an adenovirus. Plasmid DNA is introduced into the heart by stabbing the heart with a needle. The adenovirus is introduced into the blood flow. That is a fundamental difference as to how the invention is practiced. Also, beta-galactosidase is what Leiden used in their experiments to show that there was some expression of protein. That's not an angiogenic factor. Oftentimes, they refer to beta-galactosidase as a recombinant gene. If you're not reading carefully, it sounds like they have actually taught something that's meaningful and gives direction to more ordinary skill in the art. That's not the case. In many instances, they talk about capillary formation. Our position remains that capillaries are not collateral vessels. Capillaries are the smallest possible vessels. Do you lose if we do consider them to be collateral vessels? Excuse me? Do you lose if we consider capillaries to be collateral vessels? No, Your Honor, because the only instance in which they demonstrated capillary formation, again, was with this plasmid vector that was its non-adenovirus and it was introduced into the heart by the needle stabbing. We do not believe that that would reflect the combination that's required by the count and by the parties' claims. Again, the key things here is that you get the virus to the appropriate place in the body, that you have an appropriate amount of protein production at the right location for a sufficient period of time so that these collateral vessels develop. If you don't have any of those, if you break down at any one point, you're not going to get the invention. And then finally, the last one. Just for future reference, when you write a brief, it's not helpful to have such extensive quotes from the decision of the board. We read the board decision very carefully. The point there, Your Honor, was that we believe that the board, the argument was that the board had mixed up its terminology in legal analysis. We thought it might be effective to show that they had, in fact, applied the WANs factors, had conducted the appropriate enablement analysis, but we'll definitely keep that in mind for the next round. In conclusion, I just want to, again, point out that this invention involves a series of very complex biotechnological processes. The introduction of the virus, the appropriate expression in the appropriate place. This was a very significant invention. We believe that it was Hammond's invention, which is repeatedly acknowledged by Leiden. When they're asked who did it, they don't point to their own specification. They point to our specification. All right. Thank you, Mr. Bauer. Okay. First of all, Mr. Ashton is quoted from the board. The board found that Leiden showed how to make the virus, how to administer a virus. The board also found that evaluation of effects was routine within the arm. So to say that Leiden did not teach that is not what the board found. They found it to the contrary. Furthermore, what they said Leiden supposedly didn't show was that how do you keep the virus in the heart without going throughout the body? That's a therapeutic effect. That's a safety effect. In fact, that's how the board also erred by misinterpreting the count. If you take a look at the evidence the board relied on, and specifically what their expert relied on to say that one couldn't predict that this was work, was references to therapeutic activity. There's not one piece of evidence in the record which shows that if you put an adenovirus in with a growth factor via the coronary artery, collateral vessel formation did not form. Now with respect to Rasmussen and with respect to this case, in this case they didn't apply the Wands factors. The board effectively stopped once it found that the Leiden specification did not provide a reasonable expectation of success. We believe that's error. If you would have applied all the Wands factors, this would have been enabled because we teach you exactly how to do it. With respect to whether or not our specification had a specific and useful teaching, what the Genentech case tells us is that what is required in a specification for a specific and useful teaching is to teach the novel aspect of the invention. In this case, the novel aspect of the invention was putting an adenovirus into a coronary artery and getting expression. Leiden showed that. In fact, that's what example two is. They show that if you put a virus in with a beta-gal gene, not a growth factor gene, you will get expression. So there is a specific and useful teaching, and that addresses the predictability requirement. Certainly Leiden is not advocating that predictability is not a part of the analysis, but it should be applied in the way that Enzo applied it and that Elan applied it. Namely, one looks at the filing date as the findings said. Would there have been undue experimentation? And we have yet to hear where Leiden was deficient in terms of the teaching that they gave in their specification. So, as I said earlier, there is still yet no evidence of undue experimentation. If the court would then say that the only factor pertinent to an enablement analysis is undue experimentation, it would essentially be rewriting the law. What they would gut would be all the 132 practice where the patent, in order to rebut a case of lack of enablement, one would not be able to file a declaration showing that the specification was operative. So we believe that Rasmussen is limited to its facts insofar as it advocates an enablement analysis which is solely limited to reasonable expectation of success. That is not the law. It has never been the law. And if you do take... So you want us to limit Rasmussen to its facts? Yes, Your Honor. It is because it's a unique case, particularly in contrast with the case we have here, whereas in Rasmussen they just listed hundreds of compounds for multiple indications and let the art develop everything. That's not what we have here. Leiden was specific. Make it, make the adeno, drive it with a CMV promoter, that's what Hammond used, drive it with an FGF5 gene, that's what Leiden showed, and put it in a certain dosage. That is a specific and useful teaching, and that is exactly what Hammond did. Now, we don't have testimony on it, but it looks as if they essentially copied what Leiden did. And in that case, that is about the strongest case for enablement you can have without having an actual working example. And clearly the law is that you must not be required to have an actual example in order to meet the enablement standard, where you have provided a specific and useful teaching, and that's the case we have here. And we believe that's in direct contrast with Rasmussen, which was a utility case where there was absolutely no data, none whatsoever, to know if an asteroid would be effective to treat cancer, whereas in this case it's undisputed, and in fact admitted by Hammond in their specification, that the growth factors had caused collateral vessel formation. That's the Thompson reference in 1989, that's the Yanagisawa reference in 1992. All of that shows that collateral vessel formation could be achieved by the expression of a growth factor in the body, and that's why Rasmussen does not apply to this case. And particularly against the backdrop where the board said, do you enable a therapeutic result? Clearly the claim language does not require it. All it requires is the stimulation of collateral vessel formation, and we have absolutely no evidence of failure. Hammond didn't provide it, the board didn't provide it. If you provide a specific and useful teaching, ABCDE, and that's all you have to do to get a successful result, and there's no evidence of failure, that is clearly a strong case for enablement. That's what enablement is all about. Make and practice the invention without undue experimentation, and there simply is no undue experimentation on this record. All right, we thank you both. We'll take the case under advisement.